[No. 21719. *En Banc.* July 10, 1929.]

MUTUAL SAVINGS & LOAN ASSOCIATION, *Respondent,* v. ISAK JOHNSON et al., *Defendants,* W. F. JAHN & COMPANY et al., *Appellants.*[1]

[1]Reported in 279 Pac. 108.

*Roberts, Skeel & Holman* and *Glen E. Wilson,* for appellant Jahn & Co.

*C. A. Schneider* and *H. E. Peck,* for appellant Salmon Bay Sand & Gravel Co.

*Lewis & Black* and *Howard Waterman,* for respondent.

TOLMAN, J.—This is a consolidation of two pending actions made before trial. After trial on the merits, a decree was entered fixing the priorities of the several parties in and to a certain fund which had been realized by a receiver's sale of the property upon which originally the several mortgages and liens had been operative.

On this appeal, the question of priorities is alone presented.

While there is little dispute as to the facts, yet we find some difficulty in avoiding confusion and making a statement which will clearly present the situation of the contending parties. Perhaps the following will suffice.

Defendants Corwin S. Shank and wife were, in March, 1925, the owners of Loyal View Addition to the city of Seattle, subject to a certain unrecorded contract for the sale thereof to one H. C. Peters. Peters arranged to sell twenty-two lots in this addition, covered by his contract, to the defendant Isak Johnson for a consideration of $7,700, none of which was then paid, but all of which was to be secured by second mortgages

on the property. It was one of the conditions that Johnson should obtain a building loan of $25,000, to be secured by first mortgages on the property, and should proceed to build fourteen houses on the property according to certain plans and specifications agreed upon. Accordingly, the matter was presented to the respondent Mutual Savings and Loan Association, and it agreed, if the title was found satisfactory, to make a loan of $25,200 to be secured by first mortgages on the twenty-two lots.

Shank and wife, on March 20, 1925, executed a deed to Johnson as grantee, which was delivered to the loan association, to be by it delivered and recorded only if the deal went through as planned. Mr. Shank, at the same time, prepared and left with Peters or with the loan association, fourteen notes and fourteen second mortgages securing them, covering the purchase price payable to him, and which, taken together, covered all of the twenty-two lots.

In the meantime, Johnson entered into negotiations with a builder to erect the fourteen houses, and the builder began work before March 20, 1925. Appellant Jahn & Company began, on order of the builder, to deliver material to the premises on March 19, 1925, and appellant Salmon Bay Sand & Gravel Company likewise so began to deliver material to the premises on March 20, 1925. Notices were given to the owner, or reputed owner, as will appear later.

The loan association proceeded with its title search, and sent an employee to inspect the property. That employee testified:

"Q. Were you out in March? A. I was out in March, yes. Q. What time in March? A. It must have been very soon after the application was received. Q. No construction had been had at that time? A. There were quite a number of teams at work doing part

of the street grading and excavating some of the basement, as I recall. Q. Was that before the mortgages were signed? A. It must have been because the mortgage could not have been signed until I had passed on the application. Q. Then you made your report? A. Yes.''

Wholly disregarding the fact that work had already been commenced, the loan association prepared its fourteen first mortgages, had them executed and the Shank second mortgages executed, all on March 30, 1925, and the next day filed for record simultaneously the deed from the Shanks to Johnson, the first mortgages by Johnson to the loan association and the second mortgages by Johnson to Shank, and thereafter proceeded to disburse the proceeds of the loan on the written orders of Johnson.

Difficulties arose before the houses were completed and before the proceeds of the loan had been fully disbursed. It appeared that there was not enough money remaining to complete the houses, so a receiver was appointed, who, under the direction of the court, borrowed money, completed the houses, sold them and realized a net sum less in amount than the moneys advanced on the first mortgages.

The appellants contend that, having commenced the delivery of material to the premises before the execution or recording of the mortgages, their liens are prior to the liens of the mortgages. They rely in this respect upon our statute, Rem. Comp. Stat., § 1132, which reads:

''The liens created by this chapter are preferred to any lien, mortgage or other encumbrance which may attach subsequently to the time of the commencement of the performance of the labor, or the furnishing of the materials for which the right of lien is given by this chapter, and are also preferred to any lien, mortgage or other encumbrance which may have attached

previously to that time, and which was not filed or recorded so as to create constructive notice of the same prior to that time, and of which the lien claimant had no notice.''

Respondent does not deny that, by virtue of the statute, appellants' liens would have been prior to the mortgages if. Johnson had been the holder of the title when appellants began to furnish materials, but it seems to argue that Johnson acquired no title until the deed was delivered by filing it for record, and that, as all of the first and second mortgages were offered for record at the same time, the effect was to pass the title to Johnson subject to the mortgages, and not otherwise.

We think that position is correct in a general sense and as to claims which might attach solely by reason of Johnson's ownership. For instance, had there been an unsatisfied judgment against Johnson in King county, which the law makes a lien upon real estate owned by the judgment debtor, then, under the circumstances shown here, the lien of that judgment would have attached subject and subsequent to the mortgages.

Authorities are numerous to support that principle and respondent's authorities cited here, in the main, as we read them, do not go further.

This case is not controlled by the case of *Northwest Bridge Co. v. Tacoma Shipbuilding Co.*, 36 Wash. 333, 78 Pac. 996, and like cases cited. There, the executory contract for the purchase of the land, with all of its terms, was brought home to the materialman by its being recorded months before the contract for materials was made or the improvements undertaken. There, under the doctrine of *Ashford v. Reese*, 132 Wash. 649, 233 Pac. 29, no title was conveyed, while here, the intent was to pass full legal title immediately. Under the statute quoted in that case, the decision could not

have been other than it was. That statute now exists only in the later enacted Rem. Comp. Stat., § 1130, which is hereinafter quoted.

But the lien statute, which we have quoted, when read in connection with the sections which precede it, seems to show that it was the legislative intent to protect, if possible, one who furnishes labor or material, to the exclusion of mortgage liens not actually shown of record before the inception of the lien.

Rem. Comp. Stat., § 1129, provides for a lien for labor and material

". . . whether performed or furnished at the instance of the owner of the property subject to the lien or his agent; and every contractor, subcontractor, architect, builder or person having charge, of the construction, alteration or repair of any property subject to the lien as aforesaid, shall be held to be the agent of the owner for the purposes of the establishment of the lien created by this chapter: . . ."

and § 1130 reads:

"The lot, tract or parcel of land upon which the improvement is made or the property is situated, subject to the lien created by section 1129, *supra*, or so much thereof as may be necessary to satisfy the lien and the judgment thereon, to be determined by the court on rendering judgment in a foreclosure of the lien, is also subject to the lien to the extent of the interest of the person or company, who in his or its own behalf, or who, through any of the persons designated in section 1129 to be agent of the owner or owners cause the performance of the labor, or the construction, alteration or repair of the property."

From the records which come before us here from time to time, we have abundant evidence that laborers and materialmen rely upon these statutes for their protection; that, when called upon or given an opportunity to perform labor or furnish material, it is im-

practical to first examine the record to ascertain ownership, and such a course is rarely, if ever, followed.

. Nor does the lien law, Rem. Comp. Stat., § 1133, by its use of the words "owner or reputed owner," seem to contemplate that the laborer or materialman shall be held to a high degree of diligence in this respect. Search of the record at the time would have revealed the legal title in the Shanks, but it would not have revealed Peters' interest, if any, or what facts might have then existed tending to show that Johnson was the reputed owner or that he and his contractor were the statutory agents of the owner.

So here, the appellants dealt with the man in charge of the work, believing him to be at least the statutory agent of the owner. The loan association had actual knowledge of the fact that work had commenced several days before the mortgages were executed, and was in a position to fully protect itself and others by refusing to proceed with the loan, or by requiring releases to be obtained from all who had, by their labor and material, begun to improve the property. From a practical standpoint, at the time the inspection was made and the fact that the work was in progress was ascertained, the loan association was the only one who could have prevented the possibility of loss, and therefore, under well-settled principles of equity, having failed to do so, it should bear the loss.

We see no difference in principle between this case and the case of *Colby & Dickinson v. McCulloch,* 145 Wash. 561, 261 Pac. 86. True, there the work had progressed for some weeks before the mortgage was executed and recorded, while here it was a question of days only, but that is a difference in degree and not in principle.

. Respondent seizes upon certain expressions used by this court in the *Colby & Dickinson* case, indicating

that, under the facts there shown, the lien could not be impressed upon the property while the title remained in the Holmes estate, and if the Holmes estate had never conveyed, the liens must have failed.

It is argued therefrom that appellants' liens could not attach here until the title passed from the Shanks to Johnson. We think, however, that the record here discloses many important facts which were not shown to exist in the prior case. For example, it was not shown in that case that the Holmes estate had any knowledge or information that the prospective purchaser intended to improve the property. Here, it clearly appears that all parties from the very start knew and intended that the property should be immediately improved, and agreed upon plans and specifications for its improvement. Their acts show their intent beyond the possibility of denial. Why, otherwise, would Shank accept second mortgages for the purchase price? Manifestly this was done to make immediate improvement possible, and only by such improvement could the second mortgages have any value.

It is not necessary now to hold that the owners, by their acts, made Johnson and his contractor their statutory agents, because, as we have seen, of the equities of the case arising from the act of the loan association in accepting first mortgages with knowledge that the work had been commenced. But, were it necessary to the decision of the case, it would seem to take no violent construction of either the facts or of the law, to hold that the owners so dealt with Johnson as to permit and impliedly authorize him to do what he did, and that he thus became their statutory agent under the lien law.

Jahn & Company, within five days after beginning to furnish material, mailed a statutory notice to Corwin S. Shank and also to Isak Johnson. Salmon Bay Sand

& Gravel Company likewise, within five days, mailed a statutory notice to Johnson. The sufficiency of these notices does not appear to be questioned by the respondent, no issue being raised as to them either in the brief or in the oral argument. But in any event, it would seem that, under the facts of this case, Johnson might well be held to be a reputed owner within the meaning of the statute.

The judgment appealed from is reversed, with directions to give priority to appellants' claims over the claim of the respondent loan association.

HOLCOMB, BEALS, MILLARD, and PARKER, JJ., concur.

MAIN, J. (dissenting)—I am unable to concur in the majority opinion in this case.

Section 1129, Rem. Comp. Stat., in part provides that every person furnishing material to be used in the construction of a building has a lien thereon for the material furnished, whether furnished "at the instance of the owner of the property subject to the lien or his agent; . . ." Under this statute, there is no lien unless the material was furnished at the instance of the owner of the property or his agent.

In the case now before us, the material was furnished at the instance of Johnson, who, at the time, was neither owner of the property sought to be made subject to a lien, nor the agent of the owner. At that time he had no enforcible right, title or interest in or to the property. Subsequent to the time when the first material was furnished, a deed was made and the respondent's mortgage taken at the same time, and they were simultaneously recorded. If the materialmen had a lien, it would attach as of the date of the first delivery, and, as stated, this was prior to the time that Johnson had any interest in the property, legal or otherwise. It is true that, prior to the delivery of the

deed and the making of the mortgage, a representative of the respondent, the mortgage company, visited the property and observed that some work was being done. The respondent would undoubtedly be charged with the knowledge of its agent in this respect. It knew also that Johnson, at the time, was not the owner of the property or the agent of the owner, and that, under the law, it was only those who furnished material at the instance of the owner or his agent that had a right to a lien.

The case of *Colby & Dickinson v. McCulloch,* 145 Wash. 561, 261 Pac. 86, is not in point. In that case, there was before the court for construction Rem. Comp. Stat., § 1133, which, in part, provides that every person furnishing material to be used in the construction of a building shall,

". . . not later than five (5) days after the date of the first delivery of such material or supplies to any contractor or agent, deliver or mail to the owner or the reputed owner of the property, on, upon or about which such materials or supplies are to be used, a notice in writing, . . ."

It was there held that the notice required by the statute was not necessary when the material was ordered by the owner himself and was not ordered by any contractor or statutory agent. Further than this, in that case, the deed was made and delivered in escrow July 14, 1926. The mortgage was executed on the twenty-second of that month, and recorded on the twenty-third. A number of days elapsed between the delivery of the deed and the execution and recording of the mortgage. In the interim, the liens for material would attach which had been furnished prior to the delivery of the deed by the purchaser, who was then in possession and authorized to proceed with the construction of the building.

In the present case, as stated, the deed and mortgage were delivered at the same time and recorded simultaneously. There was no interim in which liens could attach.

For the reasons stated, I cannot concur in the majority opinion, and therefore dissent.

FRENCH and FULLERTON, JJ., concur with MAIN, J.