[No. 42195-0-II.   Division Two.   October 2, 2012.]

OLSON ENGINEERING, INC., *Respondent*, v. KEYBANK NATIONAL ASSOCIATION, *Appellant*.

*Donald J. Courser* and *Jill D. Bowman* (of *Stoel Rives LLP*), for appellant.

*Shawn A. Elpel* (of *Duggan Schlotfeldt & Welch PLLC*), for respondent.

¶1 HUNT, J. — KeyBank National Association appeals several superior court orders: its summary judgment for Olson Engineering Inc. in Olson's construction lien foreclosure action, its foreclosure on KeyBank's release-of-lien

bond and deficiency judgment in Olson's favor, its order preventing KeyBank's disputing its deed of trust priority over Olson's lien, and its award of attorney fees and costs to Olson. KeyBank argues that (1) the trial court improperly interpreted RCW 60.04.161 when it prevented KeyBank from disputing its mortgage priority after KeyBank filed a release-of-lien bond; and (2) Olson's single construction lien purporting to cover work performed on multiple properties was neither valid nor correct in amount because (a) Olson did not perform its work at the property owner's behest, (b) the lien's attestation clause was defective, and (c) Olson's contract to perform services was divisible among multiple properties. With the exception of the superior court's allowing Olson's single lien claim to apply to all four properties on which it worked, we reverse and remand to the superior court to consider the parties' relative lien and deeds of trust priorities and the amount of Olson's construction lien, without considering Olson's claim of lien for work performed before June 1, 2006.

## FACTS

### I. PROPERTY ACQUISITION, FINANCING, DEVELOPMENT, AND LIEN

¶2 In January 2005, Chet Antonsen, Thomas Skaar, and Pacific Western Homes Inc. agreed to sell eight parcels of land to Pacific Lifestyle Development Inc. (PL Development); they assigned an option to purchase three adjacent parcels to Juneau Investments LLC, a PL Development subsidiary.[1] PL Development, Antonsen, Skaar, and Pacific Western Homes entered into a purchase and sale agreement (PSA) reflecting their intent to develop the so called "Meriwether Properties" into residential lots in distinct phases and requiring Antonsen, Skaar, and Pacific Western

---

[1] "[PL Development]/Pacific Lifestyle Homes, Inc. [(PL Homes)] and/or its assigns" formed Juneau as a single purpose entity to hold title to the Meriwether Properties. PL Development and PL Homes also acted as Juneau's agent. Clerk's Papers at 847.

Homes to deliver to PL Development before closing a preliminary plat approval for the first development phase and an approved master plan for the second development phase.

¶3 A year later, Pacific Lifestyle Homes (PL Homes), PL Development, and Juneau, none of which yet had title to the Meriwether Properties, directed Olson Engineering to begin surveying, engineering, and general planning services for the properties, without a written contract for Olson's work. Instead, PL Homes and Olson met, and Olson billed PL Homes on "a time and materials basis" for the work Olson performed at PL Homes' oral request. Clerk's Papers (CP) at 566.

¶4 About six months after Olson began its work, on June 1, 2006, the parties closed the purchase and sale of the Meriwether Properties and recorded deeds transferring title for all 11 parcels from Antonsen, Skaar, and Pacific Western Homes to Juneau. KeyBank lent acquisition and development funds to Juneau.

¶5 The properties eventually became four separate subdivisions: Meriwether Phase 1, Meriwether Phase 2, Meriwether Hilltop, and Meriwether PURD, all of which received preliminary plat approvals by September 2007. Olson's invoices to PL Homes allocated charges among "Meriwether Subdivision Phase 1 and 2," "Meriwether Hilltop," and "Meriwether PURD," accommodating PL Homes' desire to link Olson's work to the individual subdivision that incurred the cost. CP at 557-58. According to Olson's principal, Peter Tuck, (1) through July 15, 2008, Olson worked on pump station "issues," "which affected all of the Meriwether Property"; (2) as late as July 30, Olson was still working to obtain a Letter of Map Revision-Fill (LOMR-F), which "was an issue for the whole [Meriwether] Master Plan property from the start"; and (3) although the pump station work and LOMR-F impacted all the Meriwether Properties, Olson billed this work exclusively to "Meriwether Subdivision Phase 1 & 2." CP at 702, 806. On October 1, 2008, Olson filed a single claim

of lien against all of the Meriwether Properties, asserting that PL Homes owed $74,508.51 for Olson's professional services and materials.[2]

¶6 That same October, PL Land Company II LLC (PL Land Company) obtained title to all of the Meriwether Properties (except Meriwether Phase 1). Soon thereafter PL Homes, PL Development, and Juneau sought bankruptcy protection.

## II. PROCEDURE

¶7 Early in 2009, KeyBank foreclosed on the Meriwether Properties' deeds of trust and scheduled a trustee's sale for May 29. Thereafter, on May 28, 2009, Olson filed a lien foreclosure action against PL Land Company, Juneau, and KeyBank,[3] claiming interests in all of the Meriwether Properties except Meriwether Phase 1. Olson asked the superior court (1) to enter a monetary judgment against Juneau and PL Land Company for amounts owed on Olson's construction lien; (2) to enjoin KeyBank from selling the Meriwether Properties at its trustee's sale; and (3) to enter a decree (a) establishing Olson's lien as having top priority on the Meriwether Properties (except Meriwether Phase 1) in Olson's lien foreclosure action and (b) barring and foreclosing the defendants from asserting all right, title, or interest in the Meriwether Properties (except Meriwether Phase 1).

¶8 KeyBank denied Olson's alleged construction lien priority over its (KeyBank's) deeds of trust and counterclaimed, requesting a declaratory judgment adjudicating the dispute and declaring KeyBank's deeds of trust superior

[2] Olson represented that it had begun providing PL Homes with materials and services on January 23, 2006, and that it had last provided materials and services on July 29, 2008.

[3] Olson also filed its action against Tapani Underground Inc. and Ecological Land Services Inc. Apparently, Ecological Land Services did not appear, and Tapani Underground entered into a stipulated partial final judgment with KeyBank.

to Olson's construction lien. In September 2009 KeyBank recorded and in October filed a RCW 60.04.161 "Release of Lien Bond," which provided ongoing security for Olson's lien claim and allowed KeyBank to foreclose on the Meriwether Properties at the trustee's sale free of Olson's lien.[4] "OREO Corp.," a KeyBank subsidiary, acquired title to the Meriwether Properties subdivisions through a "bankruptcy 363 sale,"[5] a deed in lieu of foreclosure agreement, and a nonjudicial foreclosure. CP at 222. The principal balance remaining on KeyBank's loans was $8.35 million; but OREO was able to recover only $2.63 million in value on the property, resulting in a $5.72 million shortfall with no available equity or surplus for other creditors.

¶9 Olson filed two motions in limine in its lien foreclosure action: (1) to preclude KeyBank from introducing evidence "contest[ing] the priority of Olson's construction lien," because KeyBank had filed a release-of-lien bond and (2) to preclude KeyBank from introducing evidence contesting that Olson had performed its work at the instance of the Meriwether Properties' owner. Report of Proceedings (Oct. 18, 2010) at 8. Olson argued that the release-of-lien bond statute did not permit parties to challenge security priorities after the filing of a release-of-lien bond. Agreeing, the superior court granted both of Olson's motions, ruling,

> [A]ll work performed by Olson . . . beginning on or about January 23, 2006 at the instance of Juneau . . . and its agent [PL Homes] was work performed at the instance of the owner of the property and satisfies the requirements of RCW 60.04.021.

CP at 98. The superior court also granted Olson's motion for summary judgment to foreclose on its construction lien, ruling that Olson could assert its lien against the properties as a whole, rather than asserting four separate lien claims

---

[4] Because Olson's lien was greater than $10,000, KeyBank's release-of-lien bond was 150 percent of Olson's lien amount, as RCW 60.04.161 required.

[5] A "bankruptcy 363 sale" apparently refers to a sale of assets under Bankruptcy Code, 11 U.S.C. § 363.

against the four subdivisions.[6] On May 16, 2011, the superior court entered a decree of foreclosure on KeyBank's release-of-lien bond and a judgment for Olson on the deficiency. Although after KeyBank sold the Meriwether Properties Juneau still owed KeyBank approximately $5.72 million, the superior court awarded a total judgment of $219,209.64[7] in favor of Olson, with judgment against the release-of-lien bond for its full proceeds of $111,763.00 and judgment against KeyBank for the remaining $107,446.64. KeyBank appeals.

## ANALYSIS

### I. RCW 60.04.161 Release of Lien Bond

¶10 KeyBank argues that RCW 60.04.161 does not prevent a trial court from adjudicating the parties' lien priorities when one party files a release-of-lien bond, citing (1) the plain language of the statute; (2) the statute's purpose to free up the subject property for sale, development, or loan security, without prejudice to and pending final determination of the lien claimant's rights; (3) consistency with other construction lien statutory provisions covering lien priority; and (4) legislative intent behind similar statutes in other jurisdictions. Olson responds that KeyBank relinquished its right to dispute lien priority when it filed the release-of-lien bond because (1) the plain language of RCW 60.04.161 does not provide for lien priority disputes; and (2) allowing parties to

---

[6] The superior court relied on Olson's and Juneau's intentions as to whether they intended a single contract or four divisible contracts for Olson's work on the Meriwether Properties. Juneau Vice-President Henry Gerhard declared that (1) as the project engineer, Olson worked on the project as a whole; (2) as part of the scope of its overall work, Olson modified the internal boundaries of the sub-parts so that all the properties would fit within the boundaries of the Meriwether Master Plan Property; and (3) at all times, Olson was performing work on the entire Meriwether Master Plan Property and, thus, all work, even if designated for a particular sub-part, was done for the project as a whole.

[7] This total comprised $74,508.51 for Olson's construction lien, $23,466.30 for prejudgment interest, and $121,234.83 for costs and attorney fees.

dispute lien priority after filing a release-of-lien bond would prejudice the rights of lienholders.

¶11 Whether RCW 60.04.161 contemplates parties' disputing lien priorities after filing a release-of-lien bond is an issue of first impression in Washington. Although we agree with Olson that RCW 60.04.161 does not mention lien priority disputes, we do not agree that filing a release-of-lien bond precludes determining lien priorities.

## A. Statutory Interpretation

¶12 We review de novo questions of statutory interpretation. *Roe v. TeleTech Customer Care Mgmt. (Colo.) LLC*, 171 Wn.2d 736, 744, 257 P.3d 586 (2011). When interpreting a statute, "the court's objective is to determine the legislature's intent." *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). The surest indication of legislative intent is the language the legislature enacted: If a statute's meaning is plain on its face, we " 'give effect to that plain meaning.' " *Jacobs*, 154 Wn.2d at 600 (quoting *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)); *see also State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). We also give an undefined term "its plain and ordinary meaning unless a contrary legislative intent is indicated." *Ravenscroft v. Wash. Water Power Co.*, 136 Wn.2d 911, 920-21, 969 P.2d 75 (1998). In determining plain meaning, we look to the text of the questioned statutory provision and "the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *Jacobs*, 154 Wn.2d at 600. RCW 60.04.900 requires us to construe it "liberally" "to provide security for all parties intended to be protected by [its] provisions."

¶13 RCW 60.04.161 provides in pertinent part:

> *Any* owner of real property subject to a recorded claim of lien under this chapter, or ... *lender* ... *who disputes the correctness or validity of the claim of lien may record*, either before or after

the commencement of an action to enforce the lien, . . . *a bond . . . to guarantee payment of any judgment upon the lien*[8] in favor of the lien claimant entered in any action to recover the amount claimed in a claim of lien, or on the claim asserted in the claim of lien. The effect of recording a bond shall be to release the real property described in the notice of claim of lien from the lien and any action brought to recover the amount claimed.

(Emphasis added.) In short, filing a bond under this statute releases the property from the lien encumbrance and allows the lien-disputing party (KeyBank) to convey the property unencumbered; the lien claimant (Olson) is entitled to the release of the lien bond proceeds if it establishes the validity and correctness of its lien. *DBM Consulting Eng'rs, Inc. v. U.S. Fid. & Guar. Co.*, 142 Wn. App. 35, 39-40, 170 P.3d 592 (2007). The plain language of the statute also implies that to be entitled to the proceeds of the lien release bond, the lien claimant must obtain a favorable judgment on the lien. RCW 60.04.161 (the bond "guarantee[s] payment of any judgment upon the lien"; it does not provide that the lien claimant will otherwise receive any of the bond amount).

¶14  The purpose of RCW 60.04.161 is to allow a party to file a bond to support transferring to the bond a lien against the property to allow the party supplying the bond to free up the property for conveyance. *DBM Consulting*, 142 Wn. App. at 40, 41. Filing such a bond, however, is not a concession by the bond-filer that the transferred lien is valid and correct. *DBM Consulting*, 142 Wn. App. at 41. The statute, however, is silent about whether, after the filing of a release-of-lien bond, the parties may challenge lien priorities. Therefore, the issue before us is whether RCW 60.04.161 (1) allows the party filing a release-of-lien bond

---

[8] Such bond must be "equal to the greater of five thousand dollars or two times the amount of the lien claimed if it is ten thousand dollars or less, and . . . equal to or greater than one and one-half times the amount of the lien if it is in excess of ten thousand dollars." RCW 60.04.161.

to dispute only the correctness and validity of the lien, or (2) merely specifies who may file a release-of-lien bond, including lenders disputing the correctness and validity of a lien.[9]

## B. Plain Meaning

¶15 KeyBank contends that (1) RCW 60.04.161 allows parties contesting the correctness or validity of a lien claim (such as KeyBank) to file a release of lien bond; (2) after satisfying those criteria, "there is nothing in the statute that precludes the court from performing its usual role in foreclosure actions of deciding priority disputes in addition to determining the correctness and validity of the lien";[10] and (3) Olson's and the trial court's readings of RCW 60.04.161 "create a conflict" with RCW 60.04.181, which requires courts to rank construction liens. Br. of Appellant at 18.

¶16 Olson counters, "The plain meaning of RCW 60.04-.161 and the mechanics of a dispute contesting priority conclusively show that priority disputes do not fall within the purview of this statute." Br. of Resp't at 16. Olson further asserts that the statutory scheme's purpose is to protect the lienholder and that allowing parties to dispute lien priority after the filing of a release-of-lien bond would diminish lienholder protection.

¶17 Both KeyBank's and Olson's interpretations of whether RCW 60.04.161 allows parties to dispute lien priority after the filing of a release-of-lien bond necessarily read language into the statute. We agree with KeyBank, however, that the plain language of the following sentence merely qualifies who may file a release-of-lien bond and that it does not limit the scope of the parties' lien priority dispute:

---

[9] We note that the statute does not restrict who may dispute lien priorities.

[10] Br. of Appellant at 16.

Any . . . lender . . . who disputes the correctness or validity of the claim of lien may record . . . a bond issued by a surety company authorized to issue surety bonds in the state.

RCW 60.04.161.

¶18 This partial reading, however, does not answer the entire question before us because the statute is silent about the parameters of the parties' lien dispute after the filing of a release-of-lien bond. Thus, we look to other related construction lien statutes to determine the plain meaning of RCW 60.04.161 with respect to determining lien priorities. *See Ervin*, 169 Wn.2d at 820.

## C. Ranking Lien Priorities

¶19 RCW 60.04.181(1), for example, expressly provides, "In every case in which different construction liens are claimed against the same property, the court shall declare the rank of such lien or class of liens";[11] the statute then goes on to prescribe the order of such ranking.[12] After ranking the liens, the court must distribute the proceeds of

---

[11] RCW 60.04.171 permits foreclosure on property subject to construction liens:

The lien provided by this chapter, for which claims of lien have been recorded, may be foreclosed and enforced by a civil action in the court having jurisdiction *in the manner prescribed for the judicial foreclosure of a mortgage*. The court shall have the power to order the sale of the property. In any action brought to foreclose a lien, the owner shall be joined as a party. *The interest in the real property of any person who, prior to the commencement of the action, has a recorded interest in the property, or any part thereof, shall not be foreclosed or affected unless they are joined as a party.*

(Emphasis added.) The last sentence of this first paragraph of the statute clearly states that a lienholder's action to foreclose on the lien, such as Olson's, cannot ignore or destroy another's recorded interest in the property, here, KeyBank's deeds of trust.

[12] KeyBank relies primarily on RCW 60.04.181, which expressly governs construction lien priority disputes, to support its interpretation of the plain meaning of RCW 60.04.161 to permit the court to rank lien priorities in general, including its lender's liens, namely its deeds of trust. KeyBank contends, "Under Olson Engineering's reading of RCW 60.04.161, the court's ranking of different construction liens can become a useless act and the statutory priority established by RCW 60.04.181 can be ignored." Br. of Appellant at 19.

KeyBank's argument, however, is valid only if we accept the first of two possible readings of RCW 60.04.181(1): (1) When "different construction liens are [initially]

any property sale to each lien or class of liens in order of its rank. RCW 60.04.181(2). Olson, however, relies on the "mechanics of the lien statute," RCW 60.04.161, to support its interpretation of whether RCW 60.04.161 allows parties to dispute lien priority after the filing of a release-of-lien bond.[13] Br. of Resp't at 10.

¶20 KeyBank foreclosed on its deeds of trust and scheduled a trustee's sale for the Meriwether Properties before Olson filed its lien claim. Thus, we review the "mechanics of the lien statute," RCW 60.04.161, with respect to rights afforded junior lienholders in a trustee's sale. Br. of Resp't at 10. RCW 61.24.080(2) and (3) clearly give deeds of trust priority over other liens, at least as to the proceeds of KeyBank's trustee's sale.[14]

---

claimed against the same property," the court must determine priority, regardless of whether the lien is later transferred to a release of lien bond under RCW 60.04.161; or (2) when "different construction liens are [initially] claimed against the same property," the court determines priority only when the parties in front of the court still claim liens against the property, not against a bond. Regardless of which interpretation of RCW 60.04.181 may be correct, the statutory language is clear that the legislature intended to grant courts authority to determine lien priority and that nothing in this statute restricts such authority to determine lien priority to construction liens claimed against a property.

[13] Olson contends that (1) when KeyBank filed its release-of-lien bond, Olson's lien on the Meriwether Properties converted to a lien on the bond proceeds, Br. of Resp't at 10 (citing *DBM Consulting*, 142 Wn. App. at 41); and (2) thus, KeyBank's release-of-lien bond prejudiced Olson by eliminating its ability to foreclose on the property and by impairing its lien-protection rights if it were to be adjudged a junior lienholder. According to Olson, potential junior lienholders would be prejudiced if parties could dispute lien priority after the filing of a release-of-lien bond because junior lienholders would lose their ability to exercise any rights of redemption or reinstatement and would then have to "wait for market values to increase or find a buyer for the property that would pay off both the lender and the lien claimant." Br. of Resp't at 12. In "support," Olson cites "Washington Foreclosure Statutes" generally, without directing us to any specific provisions of the Revised Code of Washington granting these alleged rights. Br. of Resp't at 11. Thus, we do not further consider this argument. *See* RAP 10.3(a)(6).

[14] RCW 61.24.080 provides:

*The trustee shall apply the proceeds of the sale as follows:*

(1) To the expense of sale, including a reasonable charge by the trustee and by his or her attorney: PROVIDED, That the aggregate of the charges by the trustee and his or her attorney, for their services in the sale, shall not exceed the amount which would, by the superior court of the county in which the

¶21 Contrary to Olson's argument, Washington does not provide for *statutory* redemption when foreclosure is by a trustee's sale, which a deed of trust beneficiary (KeyBank) may elect to pursue instead of traditional *judicial* foreclosure.[15] 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 17.3, at 260 (2d ed. 2004). Also, any time before the 11th day preceding a trustee's deed-of-trust foreclosure sale, a junior lienholder can cure and reinstate a defaulted loan by paying the remaining loan amount owed and any expenses incurred.[16] RCW 61.24.090(1). Such a junior lienholder "shall thereafter have included in his lien [on the property] all payments made to cure any default[ ]." RCW 61.24.090(5).

---

trustee's sale occurred, have been deemed a reasonable attorney fee, had the trust deed been foreclosed as a mortgage in a noncontested action in that court;

(2) *To the obligation secured by the deed of trust*; and

(3) The surplus, if any, less the clerk's filing fee, shall be deposited, together with written notice of the amount of the surplus, a copy of the notice of trustee's sale, and an affidavit of mailing as provided in this subsection, with the clerk of the superior court of the county in which the sale took place. The trustee shall mail copies of the notice of the surplus, the notice of trustee's sale, and the affidavit of mailing to each party to whom the notice of trustee's sale was sent pursuant to RCW 61.24.040(1). The clerk shall index such funds under the name of the grantor as set out in the recorded notice. Upon compliance with this subsection, the trustee shall be discharged from all further responsibilities for the surplus. *Interests in, or liens or claims of liens against the property eliminated by sale under this section shall attach to the surplus in the order of priority that it had attached to the property.* A party seeking disbursement of the surplus funds shall file a motion requesting disbursement in the superior court for the county in which the surplus funds are deposited. Notice of the motion shall be personally served upon, or mailed in the manner specified in RCW 61.24.040(1)(b), to all parties to whom the trustee mailed notice of the surplus, and any other party who has entered an appearance in the proceeding, not less than twenty days prior to the hearing of the motion. The clerk shall not disburse such surplus except upon order of the superior court of such county.

(Emphasis added.)

[15] In contrast, under traditional judicial foreclosure, statutory redemption allows junior lienholders, acting within a year, or in some cases eight months, after the foreclosure sale to buy the foreclosed property by paying the property's purchaser the amount it paid at the foreclosure sale. RCW 6.23.010, .020(1); 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 19.19, at 395, 397 (2d ed. 2004).

[16] Although not relevant to ascertaining the plain meaning of RCW 60.04.161, we note that Olson had an opportunity to exercise its right as a junior lienholder to reinstate the loan 11 days before the trustee's sale but did not. Instead, Olson waited until the day before the trustee's sale to file the present lawsuit.

¶22 Thus, contrary to Olson's assertion, allowing parties to dispute lien priorities after one party files a release-of-lien bond would not significantly prejudice lienholders junior to a lender because junior lienholders are already in a relatively weak position. For example, in a foreclosure sale, junior lienholders have no right of statutory redemption. And they would rarely exercise the right to reinstate the defaulted loan under RCW 61.24.090(5) because doing so (1) would require them to pay cash to a senior lienholder, namely the deed of trust beneficiary; and (2) would "benefit" only by increasing their liens against a defaulting debtor, who is unlikely to pay off their liens on the property.[17] RCW 61.24.090(5).

¶23 The legislature allows parties to alienate property during a lien dispute by filing a release-of-lien bond under RCW 60.04.161. We infer, therefore, that it is unlikely the legislature intended to allow a party whom disputing lien priority does not prejudice, to thwart another party's effective use of a release-of-lien bond simply by disputing lien priorities. Disagreeing with the superior court's reading, we hold that the plain meaning of the RCW 60.04.161 provision at issue here, when viewed in the context of the rest of this statute and the statutory scheme as a whole, permits parties to dispute lien priority after the filing of a release-of-lien bond.[18]

## II. RCW 60.04.061

¶24 RCW 60.04.061, titled "Priority of lien," provides:

The claim of lien created by this chapter upon any lot or parcel of land shall be prior to any lien, mortgage, deed of trust, or

---

[17] Under this scenario: The senior lienholder benefits by having the outstanding balance of its loan fully paid. The debtor benefits by avoiding a foreclosure sale. But the junior lienholder simply increases the proportional size of its junior lien against a debtor (1) who has already failed to pay the senior lienholder; and (2) who, under this arrangement, has just had his debt owed at default, plus expenses incurred, paid by the junior lienholder. RCW 61.24.090(5).

[18] Having determined the plain meaning of the statutory provision at issue, we need not address the parties' other RCW 60.04.161 arguments.

other encumbrance which *attached to the land after* . . . commencement of labor or professional services or first delivery of materials or equipment by the lien claimant.

(Emphasis added.) KeyBank recorded its deeds of trust on June 1, 2006, the date that title to the Meriwether Properties transferred to Juneau. Presumably, by operation of RCW 60.04.031, the earliest that Olson would be deemed to have a construction lien on these properties by virtue of its work commenced on the properties at the "instance of the owner," Juneau, was June 1, 2006, when Juneau became the owner.[19] Thus, at the very least, there is an issue of fact as to whether Olson's construction lien (filed on October 1, 2008) was "created" before or after KeyBank's deeds of trust "attached to the land" for purposes of RCW 60.04.061 lien priorities.

¶25  We hold that the superior court erred in preventing KeyBank's disputing its deeds of trust's priority over Olson's lien, in granting summary judgment to Olson, in foreclosing on KeyBank's release-of-lien bond, and in entering a deficiency judgment in Olson's favor based on its

---

[19] Washington's statutes governing property subject to construction liens provide as follows:

Except as provided in RCW 60.04.031, any person furnishing labor, professional services, materials, or equipment for the improvement of real property shall have a lien upon the improvement for the contract price of labor, professional services, materials, or equipment *furnished at the instance of the owner*, or the agent or construction agent of the owner.

RCW 60.04.021 (emphasis added); and

The lot, tract, or parcel of land which is improved is *subject to a lien to the extent of the interest of the owner at whose instance*, directly, or through a common law or construction agent *the labor, professional services, equipment, or materials were furnished*, as the court deems appropriate for satisfaction of the lien.

RCW 60.04.051 (emphasis added).

Under the plain language of these statutes, Olson had a valid construction lien on the work it performed only at the "instance of the owner," Juneau, when it became the owner on June 1, 2006. Accordingly, the superior court erred in ruling that *all* work Olson performed on the Meriwether Properties, including work performed *before* Juneau assumed ownership on June 1, was "performed at the instance of the owner of the property and satisfies the requirements of RCW 60.04.021." CP at 98.

premature and, thus, erroneous assumption that Olson's construction lien had priority over KeyBank's deeds of trust such that Olson was entitled to a judgment on KeyBank's release-of-lien bond amount. Because the trial court granted Olson's motion to prevent KeyBank from introducing evidence contesting the priority of Olson's lien, based on an erroneous interpretation of RCW 60.04.161, we reverse and remand to the superior court with instructions to allow KeyBank to introduce evidence disputing Olson's claimed lien priority.

### III. "Correct and Valid" Construction Lien

¶26 KeyBank assigns error to the superior court's grant of summary judgment to Olson. KeyBank disputes that Olson's construction lien was "correct and valid" because (1) the work on which Olson predicated its lien was not " 'furnished at the instance of the owner' " of the property or an agent for the owner, as required by RCW 60.04.021; (2) Olson's lien did not satisfy RCW 60.04.091(2) requirements because no person with valid authority signed the lien claim on Olson's behalf;[20] and (3) Olson had multiple divisible contracts to work on each of the four separate Meriwether Properties rather than a single, indivisible contract to work on the properties as a whole. Br. of Appellant at 25 (quoting RCW 60.04.021).

¶27 Olson counters that (1) it provided professional services at the instance of the owner, Juneau, or Juneau's "agent" PL Homes; (2) KeyBank did not challenge the validity of its lien's attestation clause below and cannot do so now on appeal; and (3) the work Olson performed on the

---

[20] More specifically, KeyBank contends that Olson's lien did not satisfy RCW 60.04.091(2) requirements because Olson's claim of lien was not signed by someone authorized on Olson's behalf to state affirmatively that he or she has read the notice of claim of lien and believes the lien is true and correct under penalty of perjury. But, as Olson correctly notes, KeyBank did not raise this issue with the trial court. We do not consider on appeal issues, theories, or arguments not presented at trial. *Herberg v. Swartz*, 89 Wn.2d 916, 925, 578 P.2d 17 (1978). Therefore, we do not further consider this argument.

Meriwether Properties benefitted the property as a whole. Br. of Resp't at 29. We agree with KeyBank that Olson did not have a valid lien for work performed on the property before Juneau took title on June 1, 2006, and that the superior court erred in granting summary judgment to Olson.

## A. Standard of Review

¶28 In reviewing the superior court's grant of summary judgment, we view the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000). If there are no genuine issues of material fact, courts grant summary judgment when the moving party is entitled to judgment as a matter of law. *Lybbert*, 141 Wn.2d at 34. Although normally left for the trial process, questions of fact may be treated as a matter of law when reasonable minds could reach only one common conclusion. *Colo. Structures, Inc., v. Blue Mountain Plaza, LLC*, 159 Wn. App. 654, 661, 246 P.3d 835 (2011). "A party may not rely on speculation or having its own affidavits accepted at face value." *Colo. Structures*, 159 Wn. App. at 661. We can affirm summary judgment on any ground the record supports. *Allstot v. Edwards*, 116 Wn. App. 424, 430, 65 P.3d 696 (2003).

## B. RCW 60.04.021; Work Furnished at the "Instance of the Owner"

¶29 KeyBank argues that Olson did not have a valid construction lien because it did not provide its services at the " 'instance of the owner' " of the property, as RCW 60.04.021 required; instead, Olson provided services at the instance of a merely *prospective* owner, which did not meet

the statutory requirement.[21] Br. of Appellant at 25 (quoting RCW 60.04.021). We agree.

¶30 Any person furnishing labor, professional services, materials, or equipment for the improvement of real property[22] shall have a lien upon the improvement for the contract price of labor, professional services, materials, or equipment *"furnished at the instance of the owner,"* or the agent or construction agent of the owner.[23] RCW 60.04.021 (emphasis added). In *Colorado Structures*, Division Three of this court held that under RCW 60.04.021, the term "owners" does not include *potential* owners possessing only the right to purchase a property. 159 Wn. App. at 665. In so holding, the court noted,

> [T]here is no basis for expanding the term "owner" to include those who someday hope to own the property [because] [i]t is not hard to imagine that there could be competing putative owners, let alone competing liens from those who performed services for failed bidders.

*Colo. Structures*, 159 Wn. App. at 665. This part of the court's rationale is helpful here.

¶31 The legislature used the term "instance of the owner[s]" in RCW 60.04.021, without defining this term. Thus,

---

[21] Olson does not appear to argue that it performed work at the "instance of the owner"; instead it states, "The issue here is whether, based on the equities, KeyBank should bear the loss." Br. of Resp't at 31. Olson contends that (1) whether work was performed at the "instance of the owner" relates to lien priority, an issue that is "irrelevant" based on its interpretation of RCW 60.04.161; (2) alternatively, if lien priority is "relevant," Olson's lien still has priority over KeyBank's mortgage because "the courts recognize[ ] that a relation may exist between owner of the fee and the holder of the right to purchase, such that the fee will be subjected to the lien"; and (3) therefore, "under well-settled princip[les] of equity," KeyBank should bear the loss because it "was the only one who could have prevented the possibility of loss." Br. of Resp't at 27, 34.

[22] "Except as provided in RCW 60.04.031." RCW 60.04.021.

[23] Olson concedes that "[a]gency is not an issue on appeal in the case at bar." Olson then mentions, however, that if agency were at issue, "circumstances exist that would support a finding that Juneau & [PL Homes] were agents of the Antons[e]n Group"; but Olson neither cites supporting legal authority or develops an argument that it was an agent of Antonsen, Skaar, and Pacific Western Homes, contrary to RAP 10.3. Br. of Resp't at 30-31. Accordingly, we do not further consider this potential point.

in giving the undefined term its plain and ordinary meaning, the common definition of "owners" is instructive: An "owner" is one with rights to possess, to use, *and* to convey something. BLACK'S LAW DICTIONARY 1137 (8th ed. 2004). Before closing the PSA, passing title to the property, and recording the deed, Juneau, PL Development, and PL Homes had no right to convey the property; lacking at least one critical indicium of ownership, they were not "owners" in the ordinary sense.

¶32 Our state legislature's narrowing the definition of "owner" in 1992 further supports this plain meaning. In the 1991 revision of Washington's construction lien laws, the definition of "owner" included the record holder of either the legal or the beneficial title to property. LAWS OF 1991, ch. 281, § 1(9). A year later, however, the legislature deleted this broader definition, allowing "owner" to stand alone. LAWS OF 1992, ch. 126, § 1(9). Scholars have interpreted this change to mean that the definition of "owner" is now "the record holder of the legal title" and, therefore, that the earlier beneficial title holder is no longer considered an "owner" under the statute. 27 MARJORIE DICK ROMBAUER, WASHINGTON PRACTICE: CREDITORS' REMEDIES—DEBTOR'S RELIEF § 4.52, at 347 n.1 (1998).

¶33 We hold that Juneau was not an "owner" of the Meriwether Properties until June 1, 2006, after KeyBank's recorded deed of trust transferred the property to Juneau. Thus, Olson's work at Juneau's behest before that June 1 date was not at the "instance of the owner" within the meaning of RCW 60.04.021; and, therefore, Olson's construction lien was not valid and enforceable under this statute to the extent that it included work performed at Juneau's behest before June 1, 2006.

## C. Equity

¶34 Although Olson did not perform work at the "instance of the owner" until after Juneau acquired title to

the Meriwether Properties on June 1, Olson argues that KeyBank should bear its (Olson's) losses under principles of equity. Br. of Resp't at 27, 29 (citing *Mut. Sav. & Loan Ass'n v. Johnson*, 153 Wash. 41, 47, 279 P. 108 (1929)). We do not find Olson's equity argument persuasive.

¶35 *Mutual Savings* had actual knowledge that work had begun several days before it executed two mortgages on the secured property, and it was in a position to protect itself fully by requiring the parties to file releases of liens. Some 80 years ago, our Supreme Court held that "under well-settled principles of equity," the lender must bear the loss because it "was the only one who could have prevented the . . . loss." 153 Wash. at 47. But *Mutual Savings* involved a different statutory scheme for construction lien loans,[24] and it predated the statutory changes that govern the instant case. Furthermore, unlike Mutual Savings, KeyBank likely did not have actual knowledge of Olson's work on *a property's owner's behalf. Mut. Sav.*, 153 Wash. at 47. Accordingly, *Mutual Savings* does not apply here.

## D. Divisible Contracts

¶36 Finally, KeyBank argues that the superior court erred in granting summary judgment to Olson because (1) Olson's single construction lien on all four Meriwether Properties did not accurately reflect Olson's multiple divisible contracts to work separately on each of the subdivisions; and (2) therefore, Olson untimely filed its single claim of lien for the Meriwether Hilltop and Meriwether PURD subdivisions on October 1, 2008. Olson responds that all the work it performed benefitted all the Meriwether Properties and that the intention of Olson and PL Homes was to create a single contract, rather than multiple divisible contracts.

¶37 The superior court granted summary judgment to Olson and denied summary judgment to KeyBank based

---

[24] The other case that Olson cites in support of its equity argument similarly predated the statute at issue here. *Adams v. Dose*, 87 Wash. 575, 152 P. 9 (1915).

on its finding that there were no material issues of fact and that the intention of the parties was to create one contract, instead of four divisible contracts. Instead of addressing this single-contract rationale, we affirm summary judgment on alternate grounds that the record supports, namely that Olson's single construction lien satisfied the statutory lien-recording requirements. *Allstot*, 116 Wn. App. at 430.

¶38 RCW 60.04.091 requires parties claiming construction liens to "file for recording . . . a notice of [lien claim] not later than ninety days after the [party] has ceased to furnish labor, professional services, materials, or equipment."[25] Nothing in this statute or associated statutes prohibited Olson's having filed a single lien claim under the circumstances here. We reject KeyBank's argument that (1) "Olson Engineering's practice of allocating its work to the different subdivision projects and billing [PL Homes] supports a reasonable inference that there was not a single, indivisible contract between Olson Engineering and [PL

---

[25] RCW 60.04.091 provides, in pertinent part:

Every person claiming a lien under RCW 60.04.021 shall file for recording, in the county where the subject property is located, a notice of claim of lien not later than ninety days after the person has ceased to furnish labor, professional services, materials, or equipment . . . . The notice of claim of lien:

(1) Shall state in substance and effect:

(a) The name, phone number, and address of the claimant;

(b) The first and last date on which the labor, professional services, materials, or equipment was furnished or employee benefit contributions were due;

(c) The name of the person indebted to the claimant;

(d) The street address, legal description, or other description reasonably calculated to identify, for a person familiar with the area, the location of the real property to be charged with the lien;

(e) The name of the owner or reputed owner of the property, if known, and, if not known, that fact shall be stated; and

(f) The principal amount for which the lien is claimed.

(2) Shall be signed by the claimant or some person authorized to act on his or her behalf who shall affirmatively state they have read the notice of claim of lien and believe the notice of claim of lien to be true and correct under penalty of perjury, and shall be acknowledged pursuant to chapter 64.08 RCW. If the lien has been assigned, the name of the assignee shall be stated. Where an action to foreclose the lien has been commenced such notice of claim of lien may be amended as pleadings may be by order of the court insofar as the interests of third parties are not adversely affected by such amendment.

Homes]"; and (2) consequently, Olson's failure to file multiple separate liens on the appropriate individual parcels was fatal to its solitary lien claim. Br. of Appellant at 33.

¶39 On the contrary, uncontroverted evidence shows that at least for work Olson performed after June 1, 2006, (1) the work improved the property as a whole and, thus, necessarily improved all the Meriwether properties and each of the four subdivisions; and (2) Olson performed this work on the various subdivisions at the instance of Juneau, the undisputed legal owner of the Meriwether Properties after June 1, 2006.[26] Furthermore, Olson satisfied RCW 60.04.091 technical requirements for claiming a lien on these properties: Its invoices show that Olson worked on these projects as late as July 30, 2008, within 90 days of Olson's filing its lien claim on October 1, 2008.

¶40 Thus, the superior court properly granted summary judgment to Olson to the extent that it recognized Olson's "blanket lien" under RCW 60.04.051 for work performed after June 1, 2006. We affirm summary judgment in part on these alternate grounds because, after viewing Olson's invoices, reasonable minds could conclude only that Olson satisfied RCW 60.04.051 and RCW 60.04.091 for work it performed on the Meriwether Properties at Juneau's direction after June 1, 2006. *Colo. Structures*, 159 Wn. App. at 661; *Allstot*, 116 Wn. App. at 430.

### IV. ATTORNEY FEES

¶41 RCW 60.04.181(3) allows the prevailing party to recoup "moneys paid for recording the claim of lien, costs of title report, bond costs, and attorneys' fees and necessary

---

[26] For example, Olson worked on the pump station on July 15, 2008, and the Map Revision-Fill on July 30, 2008; but despite Olson's billing this work to Meriwether Phases 1 and 2 only, both projects benefitted all four Meriwether parcels. But even if Olson had billed the projects separately to accommodate Juneau's desire to associate appropriate costs with particular projects for its internal accounting purposes, separate billings would not have undermined that Olson's work benefitted the plat as a whole.

expenses incurred by the attorney in the superior court, [or] court of appeals."[27] Both KeyBank and Olson request attorney fees and costs under this statute if it prevails in this appeal. KeyBank also contests the trial court's award of attorney fees and costs to Olson below and asserts that it (KeyBank) is entitled to attorney fees for the trial court proceeding.

¶42 The validity of Olson's construction lien depended on when it performed the work—before or after June 1, 2006, when the Meriwether Properties' title transferred to Juneau, at whose "instance" Olson performed the work that gave rise to its lien; because we hold that his lien was invalid for work performed before June 1, 2006, we

---

[27] RCW 60.04.181 provides:

(1) In every case in which *different construction liens* are claimed against the same property, the court shall declare the rank of such lien or class of liens, which liens shall be in the following order:

(a) Liens for the performance of labor;

(b) Liens for contributions owed to employee benefit plans;

(c) Liens for furnishing material, supplies, or equipment;

(d) Liens for subcontractors, including but not limited to their labor and materials; and

(e) Liens for prime contractors, or for professional services.

(2) The proceeds of the sale of property must be applied to each lien or class of liens in order of its rank and, in an action brought to foreclose a lien, pro rata among each claimant in each separate priority class. A personal judgment may be rendered against any party personally liable for any debt for which the lien is claimed. If the lien is established, the judgment shall provide for the enforcement thereof upon the property liable as in the case of foreclosure of judgment liens. The amount realized by such enforcement of the lien shall be credited upon the proper personal judgment. The deficiency, if any, remaining unsatisfied, shall stand as a personal judgment, and may be collected by execution against any party liable therefor.

(3) *The court may allow the prevailing party in the action,* whether plaintiff or defendant, as part of the costs of the action, *the moneys paid for recording the claim of lien, costs of title report, bond costs, and attorneys' fees and necessary expenses incurred by the attorney in the superior court, court of appeals, supreme court, or arbitration, as the court or arbitrator deems reasonable.* Such costs shall have the priority of the class of lien to which they are related, as established by subsection (1) of this section.

(4) Real property against which a lien under this chapter is enforced may be ordered sold by the court and the proceeds deposited into the registry of the clerk of the court, pending further determination respecting distribution of the proceeds of the sale.

(Emphasis added.)

reverse that portion of the superior court's attorney fee award to Olson attributable to defending its lien for work performed before that date. Because KeyBank is the substantially prevailing party on appeal, we award it attorney fees and costs on appeal in an amount to be determined by the trial court after (1) its remand determination of the amount KeyBank will recover from the property based on its lien/deeds of trust amounts and priorities and (2) allocation of Key's proportionate share of attorney fees and costs attributable to defending its claim on appeal.

## CONCLUSION

¶43 We affirm the superior court's ruling that Olson's single construction lien was valid and effective for all four Meriwether Properties. But we reverse the remainder of the superior court's summary judgment for Olson, its foreclosure of KeyBank's release-of-lien bond, its judgment of deficiency in Olson's favor and award of attorney fees to Olson, and its order preventing KeyBank from disputing its deeds of trust's priority over Olson's construction lien. We remand to the superior court (1) to reconsider the respective lien/deeds of trust amounts and priorities excluding, however, Olson's claim of lien for work performed at Juneau's direction before June 1, 2006;[28] and (2) to vacate that portion of its attorney fee award to Olson attributable to defending its lien for work performed before June 1, 2006.

PENOYAR, J., and ARMSTRONG, J. PRO TEM., concur.

---

[28] On remand, KeyBank's release-of-lien bond proceeds may be used to satisfy any lien claim on which Olson proves its construction lien's priority over KeyBank's deeds of trust.