[No. 21259-9-III. Division Three. April 3, 2003.]

CAMERON ALLSTOT, *Appellant*, v. THOMAS EDWARDS, *Individually and as Chief of Police*, ET AL., *Respondents*.

*Jeffry K. Finer* (of *Finer & Pugsley*), for appellant.

*Brian A. Christensen* (of *Canfield & Associates*), for respondents.

KATO, A.C.J. — Cameron Allstot appeals the dismissal of his claims arising from his decision to terminate his employment as a police officer in the town of Coulee Dam (Town). He contends the evidence presents a factual question about whether Police Chief Thomas Edwards constructively discharged him. He also contends he was not required to pursue an administrative remedy through the

Town's civil service commission. We agree and reverse and remand for trial.

This dispute began in 1991, when Mr. Allstot was fired for a comment he allegedly made to a private resident about investigative activities of the North Central Washington Narcotics Task Force. Mr. Allstot appealed to the civil service commission, which upheld the termination. On appeal of that decision, this court held there was no evidence to support the allegation Mr. Allstot had leaked investigative information. The court thus reversed the commission's decision and ordered Mr. Allstot reinstated.

Mr. Allstot returned to work in June 1994. He then demanded back wages for the period from his termination through his reinstatement. A lawsuit over this dispute resulted in a judgment against the Town in 2001 for $39,217.21. Mr. Allstot appealed the judgment, which this court reversed and remanded for retrial.

In the summer of 1994, Mr. Allstot was one of several officers involved in a training exercise involving pepper spray. During the exercise, each of the officers was sprayed in the face by a fellow officer. Chief Edwards determined that Mr. Allstot had not been sprayed adequately, obtained a larger canister of the chemical, and sprayed Mr. Allstot again, knocking him backwards and to the ground.

Mr. Allstot began to suspect that he was not being informed of drug investigations. He learned his suspicions were true when he read deposition testimony given by Chief Edwards as part of the lawsuit over back wages:

Q . . . Regarding the instruction to the other two officers, that they are not to involve Skip [Mr. Allstot] in a drug case, let me pursue that a bit and see if I understand how this works.

 If they need backup and Skip is there, they are going to have to call Skip?

A They are not going to get involved in drug cases themselves, sir.

Q So they have to stay out of it?

A Yes, sir.

Q The part where they don't involve Skip but they are allowed themselves to be involved—

A If information comes up, they pass it to me, it goes to the task force. If they stop a vehicle and there is marijuana in full view or they suspect it, they handle the case.

Q If they needed backup on the moment and Skip was their back-up guy, they could go to Skip or they couldn't?

A If he needs a backup, they are working, they have to back up.

Q So when it gets down to something like that, Skip is involved even though you have a rule about keeping him out?

A That's right, because I don't want an officer to get hurt because somebody does not back up.

Q And if the dispatcher has a call to a scene that may involve drugs, the dispatcher would go to someone else besides Skip first, if they could?

A If Skip is working, they would go to Skip.

Q So the dispatcher doesn't have an instruction to carve Skip away from—

A No the dispatcher has no instructions whatsoever.

Q Do you not keep local intelligence records and reports on leads and things of that nature involving drug cases?

A All the names we send to Okanogan. We all have access to the computer. There is information I do not want out, so it's easier to pass the information to the task force. All the departments in Okanogan County have been asked to do that.

Q Asked to do what?

A Drug information passed to them.

Q Oh, okay. Yes. But not to be kept locally?

A Well, I am sure they keep it locally.

Q Do you keep it locally?

A Yes, where we have a case with drugs.

Q And how is Skip kept out of those files?

A If anything that's—they have done locally, car stopped with marijuana, he has access to those files.

Q So the part that Skip is left out of is new information that an officer here picks up. He would not be in the oral loop, but a record would be left and he would have access to that?

A What do you mean a record would be left?

Q Well, it would be in the local records that you just described, if there was intelligence or suspicion about a drug row or an operation or transactions?

A You won't find that in none of my reports, sir.

Q Just the computer E-mail reports to the task force?

A A letter.

Q Or letter?

A Yes.

Q I am still not sure I am clear how this would work. What does Skip actually not ever hear about? I am poking around the edges. Maybe you could just point to me in the middle. What doesn't he hear?

A If we suspect Joe Blow over here using drugs at such and such a house, he doesn't hear that. Yet he may get a call to go to that particular house and he may run across drugs himself.

Q And he might not know that they are there?

A That's right.

Q Even though you knew they were there or you believed they might be there?

A Possibly.

Q It concerns you, I guess, that Skip might go to a house call that might involve drugs and he might not even know that?

A That's right.

Q That's not good for Skip.

A No, it's not. I wished I could trust him so I could tell him that.

Q You trust him to deal with it on his own when he gets there.

A If he runs across a situation, he can handle it.

Q So he doesn't need to know?

A No.

Q If he needs to know, you would tell him, right?

A That's right.

Q He doesn't need to know?

A That's right.

Q Your other officers do need to know?

A I don't tell them either. I do not pass the drug information that we receive information from the task force to this town. It does not go to the officers. If they come across something and they tell me, it goes to Okanogan.

Q But it doesn't go to each other even? Come on, they tell each other; they just don't tell Skip. Isn't that what it is?

A That's possible.

Clerk's Papers (CP) at 132-36.

Mr. Allstot resigned on February 5, 1996. His letter to Chief Edwards stated in part:

> Since my reinstatement I have felt myself isolated from pertinent investigative information, making me ineffective and possibly placing me and other officers in danger. I have felt the focus of continued suspicion and "special" treatment. During the last several months, however, I have learned that my concerns were all too real: I am kept from important information and everyone is placed at risk because of this. It is painfully clear that my relationship with my fellow officers has been irreparably damaged.

CP at 246.

Two years later, Mr. Allstot filed this lawsuit against Chief Edwards and the Town of Coulee Dam, alleging failure to adequately supervise, wrongful discharge, retaliation, and negligent infliction of emotional distress. Specifically, he alleged:

> 3.7 Allstot, although ordered reinstated by the court, was not welcomed back with open arms into the Coulee Dam police department. The differential treatment Allstot experienced

was tolerable and he assumed time would heal any remaining bad feelings.

CP at 4-5.

The superior court granted the Town's motion for summary judgment, dismissing all of Mr. Allstot's claims. The basis of the court's decision is not clear from the order, but the transcript of its oral ruling makes it clear the court held Mr. Allstot had failed to establish his claim for constructive discharge. The court did not address the Town's alternative argument that Mr. Allstot failed to exhaust administrative remedies before initiating this lawsuit.

Mr. Allstot has appealed the order granting summary judgment. He has assigned error to the dismissal of his claim for constructive discharge and to the order "insofar as it required [him] to exhaust his administrative remedies." Br. of Appellant at 3. He apparently has abandoned the other claims that were dismissed by the superior court's order.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). The burden is on the moving party to establish its right to judgment, and facts and reasonable inferences from the facts are considered in favor of the nonmoving party. *Our Lady of Lourdes Hosp. v. Franklin County*, 120 Wn.2d 439, 452, 842 P.2d 956 (1993).

On review, an appellate court's inquiry is the same as the superior court's. *Id.* at 451. It may affirm the superior court's decision on any ground supported by the record. *Redding v. Virginia Mason Med. Ctr.*, 75 Wn. App. 424, 426, 878 P.2d 483 (1994).

■■ We first consider whether Mr. Allstot was required to pursue a remedy through the civil service commission. A claimant for wrongful discharge generally must follow the procedures established by the employment relationship.

*Riccobono v. Pierce County*, 92 Wn. App. 254, 263, 966 P.2d 327 (1998).

> Civil service employment is controlled by the civil service statutes as now existing or hereafter amended, subject to Washington Constitution article 1, section 23. The Legislature intended that those statutes and regulations be the exclusive remedy for breach. Accordingly, a claimant suing for breach of an employment relationship controlled by the civil service statutes and regulations must exhaust the procedures and remedies set forth therein.

*Id.* at 263-64 (footnotes omitted).

An exception to this exhaustion requirement is that a claimant may sue for the tort of wrongful discharge in violation of public policy without first exhausting administrative remedies. *Smith v. Bates Technical Coll.*, 139 Wn.2d 793, 808-11, 991 P.2d 1135 (2000). The tort of wrongful discharge in violation of public policy is narrowly construed. *Reninger v. Dep't of Corr.*, 134 Wn.2d 437, 446, 951 P.2d 782 (1998). Here, although Mr. Allstot cites *Smith* for its holding that exhaustion of remedies is not required for a claim for wrongful discharge in violation of public policy, he has not alleged or identified any specific facts that demonstrate he was constructively discharged in violation of a public policy.

The doctrine of exhaustion of administrative remedies applies when: "(1) a claim is cognizable in the first instance by an agency alone; (2) the agency has clearly established mechanisms for the resolution of complaints by aggrieved parties; and (3) the administrative remedies can provide the relief sought." *Smith*, 139 Wn.2d at 808.

Mr. Allstot contends the doctrine does not apply here because his claim for constructive discharge is not cognizable under the civil service laws.[1] This argument assumes (and the Town concedes) that a civil service employee alleging constructive discharge has a cognizable claim in

---

[1] RCW 41.12.090 provides in pertinent part: "No person in the classified civil service who shall have been permanently appointed or inducted into civil service under provisions of this chapter, shall be removed, suspended, demoted or discharged except for cause."

*some* forum. In *Reninger,* 134 Wn.2d at 445-46, the Supreme Court declined to address whether the doctrine of constructive discharge applied to civil service employees, who may be terminated only for cause. The issue thus remains unsettled by the Supreme Court.[2] However, as the court noted in *Reninger,* 134 Wn.2d at 445, two appellate court decisions have questioned whether a claim for constructive discharge is cognizable "where other relief is available to an affected employee." *See Micone v. Town of Steilacoom Civil Serv. Comm'n,* 44 Wn. App. 636, 643 n.2, 722 P.2d 1369 ("doctrine is generally, if not exclusively, applied to employment at will situations"), *review denied,* 107 Wn.2d 1010 (1986); *see also Albright v. State,* 65 Wn. App. 763, 768-69, 829 P.2d 1114 (1992).

The Town argues simply that Washington law does not distinguish between express and constructive wrongful discharge. *See Snyder v. Med. Serv. Corp.,* 145 Wn.2d 233, 238, 35 P.3d 1158 (2001) (citing *Riccobono,* 92 Wn. App. at 263). This argument suggests that whether the discharge is express or constructive makes no difference; either way, an employee is entitled to *some* remedy for a wrongful discharge. In light of the Town's concession that Mr. Allstot has a claim cognizable in *some* forum, the issue here is whether his claim must be raised initially through the civil service procedure provided by RCW 41.12.090.

As Mr. Allstot points out, a claim for wrongful constructive discharge would be difficult or impossible to address under RCW 41.12.090, which requires a written statement of the accusation against the affected employee and also requires the employee to make a written demand for an investigation within 10 days of his or her removal, suspension, demotion, or discharge. By its nature, a constructive discharge may not be the result of a single, identifiable

---

[2] In *Smith,* 139 Wn.2d at 801-07, the Supreme Court held that claims for wrongful discharge in violation of public policy are not limited to at-will employees. Because the court held that the claimants were not required to exhaust administrative remedies before pursuing their claims for the tort of wrongful discharge in violation of public policy, it was not necessary to decide whether civil service employees have a cognizable claim for constructive discharge.

event. In this circumstance (as in this case), a written statement of accusations may not be present. And, because there is no actual dismissal, it also would be impossible to determine when the 10-day period began. These difficulties suggest the legislature did not intend for the statute to apply to wrongful *constructive* discharges.

Therefore, because the civil service commission has no clearly established mechanisms for resolving claims for wrongful constructive discharges, Mr. Allstot was not required to exhaust the administrative remedy.

 We next consider whether Mr. Allstot has alleged facts sufficient to support his claim for constructive discharge. To establish a claim for constructive discharge, a claimant must show: (1) that the employer deliberately made the working conditions intolerable for the claimant, (2) that a reasonable person in the claimant's position would be forced to resign, (3) that the claimant resigned solely because of the intolerable conditions, and (4) that the claimant suffered damages. *Haubry v. Snow*, 106 Wn. App. 666, 677, 31 P.3d 1186 (2001). A claimant may show conditions are intolerable by demonstrating aggravating circumstances or a continuous pattern of discriminatory treatment. *Id.* Whether working conditions are intolerable is a question of fact and is not subject to summary judgment unless there is no competent evidence to establish the claim. *Id.* at 677-78.

Mr. Allstot relies on three facts to establish his working conditions were intolerable. The first is the pepper-spraying incident in the summer of 1994. However, Mr. Allstot's own complaint conceded the working conditions were "tolerable" at least briefly after he returned to work in June 1994. Moreover, the incident was more than a year and a half before he resigned. This incident does not establish an intolerable working condition.

The second fact is the Town's continued refusal to resolve his claim for back wages. But this dispute is not directly related to Mr. Allstot's working conditions, and thus does not establish an intolerable, aggravating circumstance.

The third fact is Chief Edwards' decision to withhold information regarding ongoing drug cases from Mr. Allstot. Although the Town presented evidence from the chief and others indicating the policy was applied to *all* officers in the police department, Chief Edwards himself testified it created a situation that was "not good for Skip." CP at 135. This fact arguably creates a factual question regarding whether the policy was an aggravating circumstance that made his continued employment intolerable. Moreover, while each of the three facts individually may not demonstrate intolerable working conditions, together they may establish a pattern of discriminatory treatment that was intolerable.

These factual questions are for the jury. The court erred in granting the Town's motion for summary judgment.

The case is reversed and remanded for trial.

SWEENEY and SCHULTHEIS, JJ., concur.

Review denied at 150 Wn.2d 1016 (2003).