IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| LACY STOREY-HOWE, a married individual, | ) ) ) | No. 32635-7-III |
| Appellant, | ) ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| OKANOGAN COUNTY, and SHAWN MESSINGER and "JANE DOE" MESSINGER, husband and wife, and the marital community thereof, | ) ) ) ) ) | |
| Respondent. | ) | |

BROWN, J. — Lacy Storey-Howe appeals the trial court's order granting summary judgment dismissal of her hostile work environment, retaliation, constructive discharge, and negligent retention claims against her former employer, Okanogan County (County). She contends genuine factual issues remain supporting her claims and requests attorney fees. We disagree with Ms. Storey-Howe's contentions and affirm. Because she does not prevail here, we do not reach her attorney fees request.

FACTS

Ms. Storey-Howe worked as a communications deputy in the County sheriff's department from late 2009 until September 2011. Sergeant Jennifer Johnson and

Sergeant Patricia Stevens were her immediate supervisors. Communications Chief Shawn Messinger was Ms. Storey-Howe's next higher supervisor in that department.

Ms. Storey-Howe and coworkers attended a conference in Las Vegas in April 2011. When asked to attend, Sergeant Johnson allegedly related concerns about Chief Messinger's behavior. Before attending the conference, Ms. Storey-Howe had never experienced or seen any problems with Chief Messinger. But in December 2010, coworker Heather Almont had related a few incidents involving her, including Chief Messinger touching Ms. Almont's shoulders and back, singling her out for conversations, and giving her a present. Ms. Almont never complained about this behavior to anyone at the County.

Ms. Storey-Howe, Ms. Almont, Chief Messinger, and two male coworkers attended the conference. Except for repeatedly asking Ms. Storey-Howe if he could buy her a drink while at the Spokane airport, Ms. Storey-Howe did not take exception to Chief Messinger's behavior toward her while on the drive from Okanogan County to Spokane and while at the airports.

The group's luggage did not arrive in Las Vegas, and they were told to buy clothes and bill the airline. Ms. Storey-Howe joked she should pretend she went to Las Vegas to get married and buy a wedding dress. Playing along with the joke, Chief Messinger grabbed her hand. Ms. Storey-Howe felt this was inappropriate. She alleged Chief Messinger engaged in other behavior while shopping, including kicking Ms. Almont's knees and putting his arm around both her and Ms. Almont's shoulder.

2

Later that night, between 10:30 p.m. and midnight, Chief Messinger brought Ms. Storey-Howe's and Ms. Almont's luggage to their hotel room. Ms. Storey-Howe was alone. She believed the chief was intoxicated because he "was really loud," "was extremely obnoxious," and "slurred his words." Clerk's Papers (CP) at 76. Ms. Storey-Howe put her suitcase on her bed while he sat on Ms. Almont's bed, making small talk about work and the upcoming training. When Ms. Storey-Howe opened her suitcase to find a sweatshirt to wear, she saw a Transportation Security Administration form inside. Never having seen this form before, she commented on it. Chief Messinger replied, "'You're fine as long as you didn't bring your BOB with you.'" CP at 78. When Ms. Storey-Howe asked what a BOB was, Chief Messinger replied it was a battery-operated boyfriend. At this point, Ms. Storey-Howe became uncomfortable and went to plug in her phone so she could text a coworker.

As she plugged her phone in, Chief Messinger jumped on top of her and "flattened [her] onto the bed on [her] back and laid on top of [her] and yelled 'Steamroller' when he did it." CP at 81. He then asked if she wanted to wrestle. She said no and asked him to leave. Chief Messinger got off her, talked briefly about work, and then left.

The next morning, Chief Messinger knocked on Ms. Storey-Howe's and Ms. Almont's hotel room door. The first time he knocked, Ms. Almont answered. He asked Ms. Almont what time she got in the previous night and if she would be ready to attend the conference. He later knocked again, but the women were getting dressed and did

3

not answer. Later at breakfast, Chief Messinger said something about them not answering. Ms. Storey-Howe explained but thought his comment was inappropriate.

That morning, Ms. Storey-Howe called the office and reported Chief Messinger's behavior to Sergeant Johnson. Sergeant Johnson notified Undersheriff Joe Somday, who immediately began an investigation. The rest of the conference was uneventful. After apologizing to Ms. Storey-Howe on the second day of the conference and attending one class with her and Ms. Almont, Chief Messinger stayed away from her for the remainder of the trip.

Upon their return to work, because of a scheduling error, Chief Messinger, Ms. Storey-Howe, and Ms. Almont worked together the morning of May 11 for about two hours. This was the last time Ms. Storey-Howe saw Chief Messinger after the Las Vegas conference. When Sergeant Johnson arrived, the scheduling situation was reported to Undersheriff Somday, who immediately placed Chief Messinger on administrative leave; Chief Messinger did not return to work after that time. Despite knowing she could, Ms. Storey-Howe did not inform anybody of the situation before Sergeant Johnson's arrival.

The internal investigation revealed Chief Messinger engaged in inappropriate behavior and recommended he be demoted to field deputy. Instead of becoming a field deputy, he elected resignation, using up his annual leave until his July 15, 2011, termination date. Ms. Storey-Howe was upset about how the County handled his

4

resignation, pointing to the County's praise of him in local newspaper articles and an e-mail sent out asking coworkers to wish him well in future endeavors.

After Chief Messinger resigned, Ms. Storey-Howe alleged Sergeant Stevens engaged in retaliatory behavior, mainly based on a few July 2011 incidents. Ms. Storey-Howe alleged Sergeant Stevens told her not to press her sexual harassment complaint because she did not want a new boss. Despite having had a friendly working relationship, Sergeant Stevens became less friendly, allegedly making Ms. Storey-Howe's work environment "unbearable" by listening to her phone calls, asking her who she was speaking to and/or instant messaging with, once yelling at her, and denying her the right to switch a shift. CP at 106. Ms. Storey-Howe told Sergeant Johnson about this retaliatory conduct. Ms. Storey-Howe quit her job in September 2011.

In 2013, Ms. Storey-Howe sued the County for hostile work environment, retaliation, constructive discharge, and negligent retention. The trial court dismissed her hostile work environment claim, finding this was an isolated incident that was appropriately handled after it was reported. The court found an insufficient basis existed for the remaining claims and dismissed them. Ms. Storey-Howe appealed.

ANALYSIS

We review summary judgment orders de novo, engaging in the same inquiry as the trial court. *Davis v. W. One Auto. Grp.*, 140 Wn. App. 449, 456, 166 P.3d 807 (2007). "Summary judgment is appropriate only if the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

5

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting CR 56(c)). Evidence submitted and all reasonable inferences from the evidence are considered in the light most favorable to the nonmoving party. *Id.*

To overcome a motion for summary judgment, an employee "in a discrimination case must establish specific and material facts to support each element of a prima facie case." *Id.* However, the employee "'must do more than express an opinion or make conclusory statements.'" *Kahn v. Salerno*, 90 Wn. App. 110, 117, 951 P.2d 321 (1998) (quoting *Marquis v. City of Spokane*, 130 Wn.2d 97, 105, 922 P.2d 43 (1996)). "Questions of fact can be determined as a matter of law only where reasonable minds can reach but one conclusion." *Davis*, 140 Wn. App. at 456. In discrimination cases, summary judgment in favor of the employer is "often inappropriate because the evidence will generally contain reasonable but competing inferences of both discrimination and nondiscrimination that must be resolved by a jury." *Id.*

A.   Hostile Work Environment Claim

The issue is whether the trial court erred in granting summary judgment dismissal of Ms. Storey-Howe's hostile work environment claim. She contends genuine issues of material fact remain about (1) the severity and pervasiveness of Chief Messinger's conduct and (2) whether his conduct can be imputed to the County.[1]

---

[1] The County argues we should disregard Ms. Storey-Howe's declaration as speculative, conclusory, and irrelevant to the issues before the court. The declaration is relevant to the four issues we address. Where applicable, the speculative and/or conclusory nature of Ms. Storey-Howe's declaration are addressed.

6

"Washington's Law Against Discrimination [WLAD], ch. 49.60 RCW, protects employees from sexual harassment." *Kahn*, 90 Wn. App. at 118; *see also* RCW 49.60.180(3). If sexual harassment creates a hostile work environment, the harassment is actionable. *Adams v. Able Bldg. Supply, Inc.*, 114 Wn. App. 291, 296, 57 P.3d 280 (2002). Because Title VII of the federal law closely parallels the WLAD, we look to federal law as persuasive authority in interpreting the WLAD. *Washington v. Boeing Co.*, 105 Wn. App. 1, 8, 19 P.3d 1041 (2000). To establish a prima facie hostile work environment claim, an employee must show (1) offensive and unwelcome conduct that (2) occurred because of sex that (3) was serious enough to affect the terms or conditions of employment and (4) can be imputed to the employer. *Adams*, 114 Wn. App. at 296. The third and fourth elements are the two disputed here. We address them in order.

First, "[t]o constitute a hostile environment, the frequency and severity of the offensive conduct must be such as to affect the terms and conditions of employment." *Adams*, 114 Wn. App. at 296. The conduct must be more than merely offensive: "[c]asual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of employment to a sufficiently significant degree to violate the law." *Glasgow v. Georgia-Pac. Corp.*, 103 Wn.2d 401, 406, 693 P.2d 708 (1985).

A totality of the circumstances test is used to determine whether the harassment is sufficiently severe and pervasive. *Id.* at 406-07. Courts look at "whether the conduct involved words alone or also included physical intimidation or humiliation, and whether

the conduct interfered with the employee's work performance." *Adams*, 114 Wn. App. at 296-97. Federal cases consider conduct targeted at others. *See, e.g., Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001); *see also Adams*, 114 Wn. App. at 297 (using conduct all employees endured to determine there was a disputed fact regarding the third element of the prima facie case). However, "[t]he conduct must be both objectively abusive (reasonable person test) and subjectively perceived as abusive by the victim." *Adams*, 114 Wn. App. at 297.

For example, in *Adams*, all employees were subjected to the manager's temper. *Id.* at 293, 297. The manager's displays of temper included the following: (1) popping birthday balloons his employees gave him; (2) throwing a pencil down on a desk causing it to fly past the plaintiff's head before storming out of the room; (3) shouldering the plaintiff away from a computer and into a wall; (4) yanking the plaintiff's hand out of a box and yelling; and (5) yelling at other employees. *Id.* at 293-94. The court found these incidents created enough of a factual dispute as to whether the conduct was sufficiently severe and pervasive. *Id.* at 297; *see also Alonso v. Qwest Commc'ns Co., LLC*, 178 Wn. App. 734, 315 P.3d 610 (2013) (finding factual dispute where the plaintiff visited a psychiatry emergency room in response to coworkers using racially derogative terms, implying the plaintiff spoke incorrect English, and openly mocking the plaintiff's speech); *Campbell v. State*, 129 Wn. App. 10, 118 P.3d 888 (2005) (finding factual dispute where plaintiff showed she received offensive department-wide e-mails singling her out and was yelled at and mocked in front of others over a period of several

8

months). *But see Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 991 P.2d 1182 (2000) (finding no pervasively abusive working environment where a supervisor fondled a female employee's butt at an off-site company party, a female manager complained about working with the supervisor but did not allege sexual harassment, and another female employee complained to the manager about the supervisor's inappropriate sexual comments); *MacDonald v. Korum Ford*, 80 Wn. App. 877, 886, 912 P.2d 1052 (1996) (finding summary judgment appropriate where manager kissed plaintiff at work on New Year's Eve because, "beyond this single incident, [plaintiff] could not recall [manager] ever treating her in an inappropriate manner").

Here, both parties agree Chief Messinger's conduct was inappropriate, but they disagree as to whether his conduct affected the terms or conditions of Ms. Storey-Howe's employment. She partly argues Chief Messinger's conduct was much more severe than the conduct seen in other cases where summary judgment was found inappropriate. She contends his conduct, taken with his behavior toward Ms. Almont, is pervasive.

The conduct here was isolated, involving words and physical contact in a closed room. Ms. Storey-Howe was uncomfortable and perceived Chief Messinger's behavior as inappropriate. But Chief Messinger's behavior did not interfere with her work performance. While she later seemed "depressed," according to the Undersheriff's report, she still showed up for her shifts and did her job. CP at 282, 284. This is unlike in *Davis* where the employee often missed work, stating he was "mentally sick, drained."

9

*Davis*, 140 Wn. App. at 458. This single incident is more similar to *MacDonald*, where the court found an isolated indiscretion could not support a hostile environment claim, rather than to *Alonso* or *Campbell*.

Even when looking at the conduct toward Ms. Almont, Ms. Storey-Howe fails to show sufficient evidence to establish this element. Unlike in *Adams*, subjectively, Ms. Almont said she did not realize she was treated differently, and, when coworkers pointed it out, she did not take exception to his behavior. Moreover, Chief Messinger's behavior toward Ms. Almont did not interfere with Ms. Storey-Howe's ability to work as she had never seen any of this behavior in the office. In sum, Chief Messinger's behavior was not sufficiently severe and pervasive enough to support a hostile work environment claim.

Second, regarding imputation, the formulation of the sexual harassment elements as articulated in *Glasgow* is taken from federal cases interpreting Title VII. *Glasgow*, 103 Wn.2d at 406-07. In *Glasgow*, the court found harassment is imputed to an employer in one of two ways: (1) if an owner, manager, partner, or corporate officer personally engages in harassment; or (2) in the case of harassment by a supervisor, if the employer knew or should have known of the harassment and failed to take reasonable corrective action to end the harassment. *Id.* at 407.

Since *Glasgow* was decided, federal cases have stated a new test: "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority

10

over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). However, there is an affirmative defense to the imposition of automatic liability. *Burlington*, 524 U.S. at 765. The defense is available if "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and "the plaintiff . . . unreasonably failed . . . to avoid harm." *Id.*

Ms. Storey-Howe argues this court's decision in *Sangster v. Albertson's, Inc.*, 99 Wn. App. 156, 991 P.2d 674 (2000), means we must use the new federal test. The County argues we should follow the *Glasgow* test. The *Sangster* court found *Glasgow* not controlling because *Glasgow* does not discuss the effect of failing to use a sexual harassment complaint procedure and does not attempt to articulate any affirmative defenses. *Id.* at 166-67. However, the *Sangster* court noted the harasser was a manager and liability was automatically imputed to the employer under first test articulated in *Glasgow*. *Id.* at 166. Since *Sangster* was decided, this court has not invoked the new federal test. *See, e.g., Campbell*, 129 Wn. App. at 20; *Davis v. Fred's Appliance, Inc.*, 171 Wn. App. 348, 362, 287 P.3d 51 (2012). To the extent *Sangster* does alter the analysis in hostile work environment claims, it does so by applying persuasive federal law. The Washington Supreme Court has not yet adopted the new federal precedent, and considering *Campbell* and *Davis*, we follow *Glasgow*.

Interpreting Ms. Storey-Howe's argument under *Glasgow*, Ms. Storey-Howe argues Chief Messinger's conduct should be imputed to the County because Chief

11

Messinger is a manager. The *Glasgow* rule "suggests that there is some difference between managers and, collectively, supervisors and co-workers." *Davis*, 171 Wn. App. at 363. In order to automatically impute liability to an employer, a manager's rank in the company's hierarchy must be such that the manager acts as the employer's alter ego. *Id.* There is no evidence here that Chief Messinger was the County's alter ego. His authority is limited to the communications department. While he could hire, fire, and set schedules of the employees in his department, no evidence shows Chief Messinger acted as the County's alter ego. *See id.* (store manager was essentially a supervisor where his authority was limited to one department, did not help create company policies or business strategies, and had no authority to execute employer's contracts); *Francom*, 98 Wn. App. at 856 (front end manager was not a "manager" because he was simply a mid-level manager despite being able to supervise and hire employees).

Alternatively, under the second test enunciated in *Glasgow*, Ms. Storey-Howe contends the County knew or should have known of Chief Messinger's harassment. She first argues the statements made by Undersheriff Somday and Sergeant Johnson show the County actually knew of Chief Messinger's conduct. Without context, Undersheriff Somday told Chief Messinger before leaving for the conference "what happens in Vegas does not stay in Vegas." CP at 305. We cannot reasonably infer this means Undersheriff Somday was talking about Chief Messinger's flirtatious and/or harassing behavior without evidence of prior complaints about this before the trip. The same is true regarding Sergeant Johnson's alleged statements concerning Chief

12

Messinger's behavior. Ms. Storey-Howe merely speculates as to what behavior these statements may concern.

Next, Ms. Storey-Howe argues Sergeant Stevens and Sergeant Johnson should have known about Chief Messinger's behavior because they could observe it from the dispatch room. But his behavior was not as obvious as Ms. Storey-Howe makes it out to be as she herself never noticed it. Additionally, it is speculation on Ms. Storey-Howe's part as to what should have been seen. This is not the type of evidence considered when trying to overcome summary judgment.

Regardless of whether the County knew or should have known of Chief Messinger's behavior, its preventative policies shown at CP 233-237 and its actions to immediately prevent further contact between Ms. Storey-Howe and Chief Messinger are telling. Moreover, the County promptly began an investigation as soon as Undersheriff Somday learned of Ms. Storey-Howe's complaint. *See Davis*, 171 Wn. App. at 363-64 (finding a prompt and adequate response where the employer had employee apologize to plaintiff within a week of learning about the harassment). Except for the brief and immediately corrected scheduling error on May 11, 2011, the two did not see each other again after returning from Las Vegas. On May 11, Chief Messinger was placed on administrative leave by Undersheriff Somday as soon as Sergeant Johnson was notified of the situation. *See Francom*, 98 Wn. App. at 857 (finding the fact the conduct never again occurred after plaintiff's complaint was proof that employer's response was reasonable and adequate as a matter of law).

13

In sum, once the investigation concluded, Chief Messinger was demoted to field deputy where he would not have contact with Ms. Storey-Howe, but he elected to resign and use up his accrued annual leave. In addition to the preventative County policy, the County took specific preventative measures to address Chief Messinger's harassment that were reasonable, prompt, and adequate. Based on this analysis, we conclude the trial court did not err in summarily dismissing Ms. Storey-Howe's hostile work environment claim.

### B. Retaliation Claim

The issue is whether the trial court erred in granting summary judgment dismissal of Ms. Storey-Howe's retaliation claim. She contends Sergeant Stevens' express statement telling her not to pursue her sexual harassment claim coupled with the timing of Sergeant Stevens' change in behavior creates a genuine issue of material fact.[2]

RCW 49.60.210(1) provides: "It is an unfair practice for any employer . . . to otherwise discriminate against any person because . . . she has . . . filed a charge." To establish a prima facie case of retaliation, an employee must show (1) she was engaged in a statutorily protected activity, (2) the employer took some adverse employment action against her, and (3) retaliation was a substantial motive behind the adverse employment action. *Campbell*, 129 Wn. App. at 22. Solely (2) and (3) are disputed here.

---

[2] Ms. Storey-Howe contends her constructive discharge is an adverse employment action, but, as we conclude below, she was not constructively discharged.

"An adverse employment action involves 'a change in employment conditions that is more than an 'inconvenience or alteration of job responsibilities' such as reducing an employee's workload and pay." *Id.* (quoting *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004)) (internal quotations omitted). Ms. Storey-Howe was not demoted nor did she receive a change in pay or workload. Only Sergeant Stevens' behavior is criticized. Sergeant Stevens' coolness during the limited supervision in July 2011 may have inconvenienced Ms. Storey-Howe, but decreased friendliness and less collegial supervision is not itself an adverse employment action. Thus, her retaliation claim fails.

## C. Constructive Discharge Claim

The issue is whether the trial court erred in granting summary judgment dismissal of Ms. Storey-Howe's constructive discharge claim. She contends Sergeant Stevens' behavior made her work environment objectively and subjectively intolerable, forcing her resignation.

Resignations are presumed voluntary, and an employee who resigned must introduce evidence to rebut this presumption. *Sneed v. Barna*, 80 Wn. App. 843, 849, 912 P.2d 1035 (1996). "Constructive discharge occurs where an employer deliberately makes an employee's working conditions intolerable, thereby forcing the employee to resign." *Id.* Thus, to establish a claim for constructive discharge, an employee must show: "(1) that the employer deliberately made the working conditions intolerable for the [employee]; (2) that a reasonable person in the [employee's] position would be forced to

15

resign; (3) that the [employee] resigned solely because of the intolerable conditions; and (4) that the [employee] suffered damages." *Allstot v. Edwards*, 116 Wn. App. 424, 433, 65 P.3d 696 (2003). Courts inquire as to whether "'working conditions [were] so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Sneed*, 80 Wn. App. at 849 (quoting *Stork v. Int'l Bazaar, Inc.*, 54 Wn. App. 274, 287, 774 P.2d 22 91989)). To show conditions are intolerable, an employee can demonstrate aggravating circumstances or a continuous pattern of discriminatory treatment. *Id.* at 850. In general, the question of whether working conditions were intolerable is one of fact; summary judgment is inappropriate unless no competent evidence supports the claim. *Allstot*, 116 Wn. App. at 433.

Ms. Storey-Howe unpersuasively relies on *Haubry v. Snow*, 106 Wn. App. 666, 31 P.3d 1186 (2001), and *Allstot*. In *Haubry*, the court found constructive discharge a question of material fact where the employer constantly leered at the plaintiff, made inappropriate sexual comments, and made physical sexual advances. *Haubry*, 106 Wn. App. at 672-73, 677-78. In *Allstot*, a police chief withheld information from the plaintiff (a police officer) regarding ongoing drug cases; despite applying this policy to all officers, the chief testified this was "not good" for the plaintiff. *Allstot*, 116 Wn. App. at 434. The court found this, coupled with a claim of being pepper-sprayed and the refusal to resolve plaintiff's claim for back wages, potentially established a pattern of intolerable discriminatory treatment. *Id.* at 433-34.

16

Ms. Storey-Howe presents no constructive discharge facts. Her claim is based on Sergeant Stevens' behavior and the County's public response to Chief Messinger's resignation, but the alleged changes after Ms. Storey-Howe filed her sexual harassment complaint did not create unreasonably intolerable working conditions. First, Sergeant Stevens began listening to Ms. Storey-Howe's calls; Ms. Storey-Howe admits this is appropriate supervisory behavior. Ms. Storey-Howe concludes this is intolerable because supervisors normally listen to calls only when doing job evaluations, but this type of conclusory statement is insufficient to overcome summary judgment. Second, Sergeant Stevens continually asked who Ms. Storey-Howe was talking with on the phone and/or instant messaging. Having to answer such questions might be inconvenient, but it is not unreasonably intolerable. Similarly, Sergeant Stevens' limited gruffness with Ms. Storey-Howe in front of coworkers and her refusal to allow one scheduling change is not enough to create intolerable working conditions. *See Sneed*, 80 Wn. App. at 850 (no evidence of constructive discharge where plaintiff had to share a secretary and supplies because her new position had no budget or assistance, was moved to a small and noisy office, and received no guidance because these allegations, while frustrating, were not objectively intolerable); *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 638, 700 P.2d 338 (1985) (mere dissatisfaction with working conditions does not negate the voluntariness of a resignation).

As for the County's response to Chief Messinger's resignation, Ms. Storey-Howe has not demonstrated a genuine issue of material fact. The newspaper articles did not

17

say anything untrue and were limited in scope. The first article stated Chief Messinger was "one of the best" primarily because he was good at getting funding for the department. CP at 344. The second newspaper article stated Chief Messinger left on his own, a true statement, followed by the sheriff's refusal to comment further. In regard to the e-mail, it was a one-time communication. Ms. Storey-Howe never saw Chief Messinger after May 11 and was not forced to wish him well. Ms. Storey-Howe presented no evidence the County acted deliberately to create intolerable working conditions by making these statements. As such, the County's actions did not create unreasonably intolerable working conditions.

Unlike in *Haubry*, Ms. Storey-Howe was not on the receiving end of continuous aggravating sexual harassment before she resigned. And unlike in *Allstot*, the behavior here by both Sergeant Stevens and the County was not unreasonably intolerable nor demonstrative of a continuous pattern of discriminatory treatment, even when viewed together. Given this record, Ms. Storey-Howe has failed to rebut the presumption her resignation was voluntary.

### D. Negligent Retention Claim

The issue is whether the trial court erred in granting summary judgment dismissal of Ms. Storey-Howe's negligent retention claim. She contends (1) the claim is not duplicative, (2) the County knew of Chief Messinger's behavior, (3) and the County did nothing.

18

"An employer may be liable for harm caused by an . . . unfit employee if (1) the employer knew, or in the exercise of ordinary care, should have known of the employee's unfitness before the occurrence; and (2) retaining the employee was a proximate cause of the plaintiff's injuries." *Betty Y v. Al-Hellou*, 98 Wn. App. 146, 148-49, 988 P.2d 1031 (1999). While an employer can be liable for negligent retention, a plaintiff may not make a duplicative claim. *See Francom*, 98 Wn. App. at 866.

In *Francom*, the court found the plaintiff's negligent supervision/retention claim was duplicative because the plaintiff relied on the same facts to support her discrimination claim. *Id.* Ms. Storey-Howe relies on the same facts to support her hostile work environment and negligent retention claim. She argues her negligent retention claim is not duplicative because negligent retention, unlike hostile work environment, requires her to show the County knew or should have known of Chief Messinger's unfitness.

First, as discussed above, we have rejected Ms. Storey-Howe's hostile work environment claim. Second, the *Francom* court's decision was not based on what a plaintiff needed to show for each individual claim; rather, its decision was based on whether the same facts were used as a basis for each individual claim. The court found allowing recovery under both theories would permit the plaintiff to be compensated twice for the same emotional injuries. *Id.* at 864-66.

In context, Ms. Storey-Howe's claim for negligent retention is duplicative. Even so, Ms. Storey-Howe has not shown a genuine issue of material fact. As discussed

19

above, the County did not know, nor should it have known, of Chief Messinger's

unfitness. Thus, Ms. Storey-Howe cannot show the first element of a negligent

retention claim. Therefore, her negligent retention claim fails.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

Brown, A.C.J.

WE CONCUR:

Korsmo, J.

Lawrence-Berrey, J.

20